## PEOPLE v. SEIDENSHNER et al.

(Supreme Court, Special Term, New York County. April, 1914.)

1. CRIMINAL LAW ☞956—MOTION FOR NEW TRIAL—CONSIDERATION OF SUP-PORTING AFFIDAVITS.

Affidavits in support of a motion for new trial must be considered in view of the testimony had in open court.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2373–2391; Dec. Dig. ☞956.]

2. CRIMINAL LAW ☞945—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—MATE-RIALITY.

Where there had been testimony on a trial for murder tending to show preparation and combination by defendants for the commission of the crime, such evidence being merely a step in the chain of proof, its contradiction by affidavit was insufficient to warrant a new trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327, 2336; Dec. Dig. ☞945.]

3. CRIMINAL LAW ☞944—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—WEIGHT—FAILURE OF WITNESS TO TESTIFY PREVIOUSLY.

The failure of one, testifying by affidavit in support of a motion for new trial after a conviction of murder, to come forward as a witness until the last moment, when he would not be subject to examination or contradiction, justified the court in placing little reliance on his testimony.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2335; Dec. Dig. ☞944.]

4. CRIMINAL LAW ☞945—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—IDEN-TIFICATION BY NEWSPAPER CUTS.

Newly discovered evidence that not one of the defendants was among the four who had committed the murder, when affiant's only knowledge of the appearance of defendants had been gained through newspaper cuts, was wholly insufficient to warrant a new trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327, 2336; Dec. Dig. ☞945.]

5. CRIMINAL LAW ☞941—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—CUMU-LATIVE EVIDENCE.

On a motion for new trial after a conviction of murder, evidence by affidavit tending to sustain an alibi, standing alone and unsupported by unquestionable proof, is worthless, where the defense of alibi was presented at the trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2328–2330; Dec. Dig. ☞941.]

6. CRIMINAL LAW ☞905—MOTION FOR NEW TRIAL.

There was, at common law, no right in criminal cases to move for new trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2128, 2133, 2404, 2405; Dec. Dig. ☞905.]

Jacob Seidenshner and others were convicted of murder, and they move for new trial. Denied.

Wahle & Kringel, of New York City, for the motion.

Charles S. Whitman, Robert C. Taylor, James A. Delehanty, John Minton, Jr., and Frederick J. Groehl, all of New York City, opposed.

GOFF, J. Within a few hours, excluding the intervening Sunday, of the sentence of death being executed upon the defendants, they

make application for a new trial. This application was, in ordinary observance of the rules, referred to me by the justice of this court before whom it was made. Such reference was made because the law requires that a motion for a new trial must be made before the justice who presided at the trial. Were it possible, in the sense of judicial propriety, for me to avoid hearing the application, I would have done so, to the end that a stranger mind would. be employed, and that I would be relieved from a very onerous and heart-searching burden. But the law casts upon me a responsibility and a duty, and no matter how grave the responsibility may be, or how disagreeable the duty, I shall not shift the one, nor fail to discharge the other.

[1] On behalf of the defendants there have been presented 19 affidavits, some of which are original and others copies of originals already filed with his excellency, the Governor. On behalf of the people the district attorney has filed 10 affidavits designed in reply to, in a more or less degree, the affidavits presented in favor of the motion. Of the 19 affidavits mentioned, 15 should be disregarded, as they consist mainly of hearsay, impressions and matters that are irrelevant and immaterial. Of the remaining 4 affidavits, those of Dresner, Burwell, Kalmanson, and Rao will be considered as of any probative value whatever. Consideration of these 4 affidavits must include the oral examination and cross-examination had in open court.

The points of importance dwelt upon by Dresner were: That he was present on the 13th of July, 1912, outside the Garden Restaurant, when he heard Rose say to Vallon and Webber, as Rosenthal emerged from the restaurant:

"There he comes. Go and put it over him!"

That Dresner, understanding what that meant, crossed the street to avoid danger, and that Rose took him for a Burns detective. Rose did not so testify on the trial. What Rose testified to was:

"It began to look too much like business, and I called Louie aside, and 1 said, pointing to a man across the street, 'Do you see that fellow over there?' He said, 'Yes.' I said, 'I am almost positive that is a Burns man that District Attorney Whitman has assigned to watch Rosenthal.' They took the hint and departed and went home. I did not know whether or not the man was a Burns man or a Burns detective. I knew nothing about that at all. I just used that. It began to look like business, and that never was my intention at any time to bring about the murder of Rosenthal."

[2, 3] This testimony of Dresner bears the unmistakable stamp of being made to fit Rose's testimony, to show an apparent want of foundation for the presence of a Burns detective. Rose did not say that he was a Burns detective, but he made use of the appearance of the man as a pretext to ward off the impending killing of Rosenthal. It is somewhat remarkable that, notwithstanding the apprehension of Dresner that something dire was going to happen, nothing did happen because of the words alleged to have been uttered by Rose. On the contrary, Rosenthal walked down the avenue with his wife unmolested. The incident thereupon closed. While the testimony of Rose on the trial concerning the incident at the Garden Restaurant was competent to show preparation and combination on the part of the defendants for

the commission of a crime, it was merely a step in the progression of proof, and a contradiction of that, even if true, would of itself be wholly insufficient to warrant the granting of a new trial.

This witness went on to narrate what he says he observed on the morning of the 16th, when Rosenthal was killed. He did not testify that he saw the killing, or that he heard shots, notwithstanding he was in Forty-Third street at the time of the killing and the passing of the automobile. He claims to have identified Vallon, Webber, and Schepps in the passing automobile. It is remarkable that this witness should be found to be present at these two important times—that is, on the 13th at the Garden Restaurant, and on the 16th in Forty-Third street at the time of the killing. Yet he heard no shots, nor did he see any one fire. Intrinsically this testimony is unworthy of credence, and if there was no other element for that conviction it is furnished by the witness himself, inasmuch as, knowing the widespread notoriety given to the murder of Rosenthal and a knowledge on his part of the importance of his testimony, he refrained from coming forward and making known to counsel for the defendants or to the district attorney what he had heard and observed. The only reasons he assigns for his failure is that he was in fear of his life. Of whom he was afraid he does not state, and his failure, where human life was involved, to come forward as a witness until the last hour, when opportunity for examination or contradiction is not given, is a circumstance of invention so strong that no reliance can be placed upon his testimony.

[4] Burwell testified that when on Forty-Third street on the morning of Rosenthal's death he heard two shots and saw the man who fired the shots turn. He said he did not know the man, but described to some extent his personal appearance. The point of his testimony rests on his statement that neither of the four defendants was the man who fired the shots. Burwell never saw any one of the four defendants, and the only knowledge he has of them was derived from his seeing some pictures purporting to represent the defendants in a clipping from a newspaper. It is unnecessary to dwell for a moment on the utter insecurity of such testimony as tending to anything like accurate identification. The mere negative statement that the man who fired the shots was not one of four persons whose faces were outlined in a newspaper, without any evidence that such outlines are true and correct representations of the defendants, and in the face of positive testimony that the defendants fired the shots, is worthless. Identification from portraits is of itself risky and dangerous, and without some supporting or connecting evidence should not be given much weight in a court of law. But identification by newspaper cuts goes to yet a greater extreme, and no value should be attached to it. This witness, like Dresner, maintained silence until the last hour, notwithstanding that he knew of the public interest and excitement in the Rosenthal Case.

[5] Rao testified to the delivery of a note from a female friend of Cirofici at his house. The only bearing that this testimony can have is upon the alibi interposed by Cirofici at the trial. Evidence to sustain an alibi on a motion for a new trial, where the alibi has been passed upon by a jury is, according to all the authorities, standing alone and

unsupported by unquestionable proof, of little or no value. This witness, like the preceding witnesses, did not come forward until the last hour to give his testimony, though he had been questioned by a deputy commissioner of police, to whom he admitted he lied in respect to the delivery of this letter.

Kalmanson testified that he was in Forty-Third street, saw an automobile, and recognized Vallon standing on the running board holding a pistol in his hand. He did not know Vallon, had never seen him, and the only means of recognition that he had was that two months later he saw in a Cleveland newspaper a picture purporting to be that of Harry Vallon. The vice of this testimony is similar to that of the testimony given by Burwell, before referred to. It is alike worthless. This witness also maintained silence until after the decision of the Court of Appeals in the Becker Case, and then he said he told his employer in Buffalo of it, who advised him to communicate with Becker's lawyer.

Briefly have I touched upon the principal part in the testimony of each of these four witnesses, and in doing so I have not referred to the testimony or the affidavits in contradiction, nor to the impression which was produced upon my mind during their examination and cross-examination. That impression was most persuasive of disbelief in what they said. If no other circumstance existed but that of their silence and delay in coming forward until the last moment, notwithstanding there existed great public excitement and widespread newspaper reports and comments, of which the Court of Appeals has taken judicial notice, it would of itself be sufficient to create grave doubts of their truthfulness and good faith.

[6] At common law a convicted man could not avail himself of a motion for a new trial. That privilege as it exists to-day is purely of statutory creation. The statute (section 465, Code Cr. Proc.) provides that the proffered evidence must be newly discovered since the trial, that, if before received, such evidence would probably have changed the verdict, and that the failure to produce it on the trial was not owing to want of diligence. I cannot say that the failure to produce the proffered evidence on the trial was owing to want of diligence on defendants' part; but the failure of the witnesses to communicate or make known their testimony is, in my opinion, a badge of distrust and suspicion. It would be a violence to my conscience and judgment to say that the proffered evidence given by the witnesses whom I have seen and heard would probably have changed the verdict, if given upon the trial which resulted in the conviction of the defendants.

On the law and the facts they have had a fair trial, and a jury of their fellow citizens has pronounced them guilty. The court of last resort has unanimously affirmed that conviction. Appeal has been made for executive clemency, and in these last moments, a year and five months after the conviction, when the crime itself is almost forgotten and human sympathies are deeply touched at the prospect of four human beings paying the highest penalty known to the law, strenuous efforts are made to arrest the judgment of that law. Were those efforts directed alone to human sympathy there would be but one an-

swer.  But they are not directed to human sympathy.  They are directed to an instrument of the law whose sole duty is to administer justice, and, no matter how harsh it may seem, it is nevertheless justice to deny the motion.